United States District Court
District of Massachusetts

```
_____
                                )
VIKEN DETECTION CORPORATION,    )
                                )
        Plaintiff,              )
                                )
        v.                      )      Civil Action No.
                                )      19-10614-NMG
VIDERAY TECHNOLOGIES INC. and   )
PAUL E. BRADSHAW,               )
                                )
        Defendants.             )
_____)
```

## MEMORANDUM & ORDER

GORTON, J.

Viken Detection Corporation ("Viken" or "plaintiff") filed a complaint against Videray Technologies Inc. ("Videray") and its founder and president, Paul Bradshaw ("Bradshaw") (collectively "defendants"), alleging that Bradshaw misappropriated confidential information of Viken when he left the company to form Videray and to produce and market a competing product using that information. Viken asserts that defendants' conduct constitutes a violation of 1) the Defend Trade Secrets Act ("the DTSA"), 18 U.S.C. § 1836(b)(1), and 2) the Computer Fraud and Abuse Act ("the CFAA"), 18 U.S.C. § 1030, as well as 3) misappropriation of trade secrets under M.G.L. c. 93, §§ 42 and 42A, 4) breach of contract, 5) breach of the duty of loyalty and 6) tortious interference with contracts.

In April, 2019, Viken filed a motion for a temporary restraining order and a preliminary injunction enjoining defendants and their agents and employees from: 1) using and/or disclosing Viken's trade secrets or other confidential information; 2) proceeding with the commercialization, sale, marketing and development of Videray's competing product; and 3) destroying any potentially relevant information, including but not limited to data in defendants' business and personal email accounts, Dropbox accounts, cellular telephones and business and personal computers and components which relate to handheld X-ray backscatter imagers.

Viken also sought an order directing defendants to return to plaintiff all confidential and proprietary information acquired during their confidential relationship with Viken or obtained from another having a confidential relationship with Viken.  Shortly thereafter, this Court denied the motion for a temporary restraining order but scheduled a hearing on the motion for a preliminary injunction.  For the reasons that follow, the motion for a preliminary injunction will be denied.

I.   **Background**

   A.   **The Parties**

Viken is a Delaware corporation with its principal place of business in Newton, Massachusetts.  Prior to February, 2019, it was named Heuresis Corporation.  Viken produces and sells hand-

held x-ray scanners used by law enforcement and security professionals to discover concealed explosives, narcotics and other contraband quickly and cost-effectively.  Among Viken's main products is the HBI-120, which is an ergonomic, hand-held x-ray backscatter imaging device.

Videray is alleged to be a Delaware corporation with its principal place of business in Boston, Massachusetts.  Bradshaw is allegedly a resident of Hull, Massachusetts, and the founder and president of Videray.  He is also a former employee of Viken.  Videray has developed the PX1 which is a hand-held x-ray backscatter imager.

### B.   Bradshaw's Employment with Viken

Viken hired Bradshaw in November, 2013, as its Director of Engineering.  He also allegedly acted as Viken's Information Technology ("IT") Administrator during his time at the company. At some point during his employment, Bradshaw and six other employees were assigned to a team to develop the HBI-120.  Dr. Peter Rothschild, Viken's physicist and Chief Technology Officer, led this team in developing the HBI-120 which took over two years and cost millions of dollars.

As part of his role on that team and as Viken's Director of Engineering, Bradshaw had access to the company's proprietary and confidential information regarding the design, performance, marketing and strategic plan for the HBI-120, as well as

-3-

potential modifications, improvements and design changes to that device. That information was stored electronically on Viken's server and on certain employee computers which were subject to access restrictions and password protection. In his capacity as IT Administrator, Bradshaw was also allegedly charged with implementing and overseeing most or all of the electronic access controls used to protect the HBI-120 proprietary and confidential information.

In addition to storing proprietary and confidential information on his desktop computer and laptop, Bradshaw also stored nearly 1,800 files related to the manufacturing, design and cost of the HBI-120 in his personal Dropbox account. He also maintained files related to the plans for other Viken products in his personal Dropbox, including trade secrets with respect to Viken's x-ray fluorescence systems. That account also contained nearly 1,000 files that are allegedly confidential property of American Science & Engineering ("AS&E"), the company for which both Bradshaw and Dr. Rothschild worked before joining Viken.

Other employees on Viken's research and development team purportedly had access to the files in Bradshaw's Dropbox account, including Dr. Rothschild, and the former CEO of Viken (then known as Heuresis), Henry Grodzins ("Grodzins"), who was also aware that Bradshaw was using his Dropbox account to store

-4-

sensitive information.  The current CEO of Viken, Jim Ryan,
attests, however, that he is not aware that anyone at the
company previously knew that Bradshaw stored sensitive Viken
documents in his personal Dropbox account.

Viken requires all new employees to sign a nondisclosure
agreement ("the NDA") to further ensure protection of its trade
secrets and confidential information.  Bradshaw signed the NDA
as a condition of his employment.  Pursuant to that contract, he
agreed that

> [a]t all times, both during my employment by [Viken]
> and after its termination for whatever reason, I will
> keep in strictest confidence and trust all Proprietary
> Information, and I will not use or disclose any
> Proprietary Information without the written consent of
> the Company, except as may be necessary in the
> ordinary course of performing my duties to the
> Company.

The NDA defines "Proprietary Information" as including, among
other things,

> (i) information relating to products, inventions,
> materials, compounds, discoveries, trade secrets,
> know-how, improvements, developments, methods,
> designs, algorithms, techniques, processes, formulas,
> strategies, software and documentation, and computer
> programs of the Company . . . , (ii) reports, studies,
> data, plans, forecasts, projections, financial
> statements, budgets, business forms, contract forms,
> licenses, prices, costs, and lists of (and other
> information relating to) investors, customers,
> clients, suppliers and employees of the
> Company . . . , [and] (iii) information relating to
> transactions or prospective transactions involving the
> Company . . . .

Bradshaw also agreed that

> [i]n the event of the termination of my employment by
> me or by the Company for any reason, I will deliver to
> the Company all documents, notes, drawings,
> specifications, data, and other materials of any
> nature pertaining to my work with the Company and/or
> containing Proprietary Information (and delete all
> electronic copies of such documents, notes, drawings,
> specifications, data and other materials from any
> personal computers and other electronic storage
> devices that I own or control), and I will not retain
> any copies of the foregoing.

Furthermore, he agreed that during his employment and for a period of one year thereafter, he would not 1) recruit or solicit for employment an employee of Viken or an affiliate of the company (or a former employee within his or her one-year grace period) or 2) interfere with Viken's business relationships with other persons or companies by inducing or attempting to induce a person or company to refrain from or discontinue doing business with Viken.  Finally, he agreed that damages at law would be an insufficient remedy to Viken in the event of a breach of the NDA and that it could obtain immediate injunctive relief to restrain the breach or threatened breach of the agreement or to specifically enforce any of its terms.

### C.    The Alleged Misconduct

In June, 2017, Katie McCabe ("McCabe"), a former employee of Viken, informed the company that while Bradshaw was still working at Viken, he told her that he planned to leave and start a new company that would produce and sell a competing product. She also alleged that Bradshaw met with a potential investor

while employed at Viken to solicit funds for his new company.
He also purportedly solicited co-workers at Viken to join him at
his new company and that as part of that solicitation, he
accessed confidential salary and equity information from Viken's
protected server to induce the employees to join him.  She also
alleged that Bradshaw failed to share customer feedback with
Viken as to potential product improvements while telling his co-
workers that his new product would include those improvements.
She told Viken that Bradshaw asked other employees to help him
collect confidential Viken customer information for use at his
new company.  Finally, Bradshaw apparently told McCabe that, in
reference to a computer on which he kept proprietary and
confidential information about the HBI-120, "I have everything I
need".  Bradshaw denies those allegations but at least one other
employee of Viken has verified McCabe's assertions.

In May or June, 2017, as a result of McCabe's allegations,
Viken terminated Bradshaw's employment.  A few days later,
however, then-CEO Grodzins offered to reinstate Bradshaw because
he believed that McCabe was lying or exaggerating about
Bradshaw's alleged misconduct.  Bradshaw alleges that Dr.
Rothschild was aware that he was asked to return to Viken.
Bradshaw refused the offer of reemployment and has also declined
to sign a proffered non-compete agreement with Viken on two
occasions since leaving the company.

Viken alleges that within two months of leaving the company, Bradshaw formed Videray.  Videray has developed and is about to market the PX1 which apparently has the same external design, ergonomics and operating characteristics as Viken's HBI-120.  Viken alleges that the PX1 1) is the same size and shape, 2) uses approximately the same x-ray energy and power and 3) likely achieves the same x-ray shielding requirements for user safety as the HBI-120 by using

> a combination of Viken trade secrets involving characteristics of the X-ray anode, X-ray shielding material (alloy), and source-detector geometry.

Viken asserts that it first learned about Videray's development of the PX1 in March, 2019, and that the PX1 includes certain design modifications that were taken from confidential Viken documents which Videray advertises as product advantages on its website.  Those modifications include 1) increased power by upgrading to "140 [keV]", 2) providing "[i]mage analysis and processing . . . object recognition capability" and 3) using a touch screen interface with additional buttons to control the device. Viken purportedly maintained those design modifications as trade secrets for possible future use and Bradshaw had access to that information during his employment with Viken.  Plaintiff refers to the files maintained in Bradshaw's personal Dropbox account (which it discovered

-8-

through a forensic examination of Bradshaw's old laptop left with Viken after his separation from the company) as evidence that he misappropriated and misused proprietary and confidential information after he left Viken.

In March, 2019, Viken was informed by its distributor in Asia that Videray was bidding on a Vietnam tender which was still open at that time.  It also learned from a representative of the National Aeronautics and Space Administration that Videray had an open order for an initial 100 units of the PX1. Viken believes that a Chinese company called Nuctech may be supplying that order based on Bradshaw's past contacts with the company while employed with Viken which defendants deny.

### D.  The Parties' Arguments and Relevant Affidavits

Viken asserts that Bradshaw misappropriated proprietary and confidential information with respect to the HBI-120 in order to develop and market a competing product in violation of trade secret law and various provisions of his NDA.  It submits that the use and dissemination of that confidential information will cause irreparable harm to Viken because it will no longer enjoy the competitive advantage of those trade secrets.  It thus seeks a preliminary injunction to restrain defendants' further use of those trade secrets and the production and sale of any products developed using that proprietary and confidential information.

Defendants respond that Bradshaw never solicited funds from investors or employees to join his new company while at Viken. Nor did he access any computers or confidential information without authorization or fail to share customer feedback with Viken about its products.  Defendants assert that McCabe's allegations as to Bradshaw's alleged misconduct are false and that he was wrongfully terminated.  They also maintain that Bradshaw deleted all Viken files from his personal Dropbox account upon his termination and did not continue to have access to those files after his separation from the company.  They submit that his Dropbox account only contained non-confidential manufacturing data which were sent to suppliers.

Defendants aver that they developed the PX1 without the use of Viken's proprietary and confidential information.  They claim that the PX1 uses x-ray anode characteristics, x-ray shielding materials and source-detector geometry different from the HBI-120 and that the general size, shape, power usage and general weight of a x-ray scanner are not protectable trade secrets because they are generally known information in the industry. Moreover, x-ray shielding requirements cannot be a trade secret because they are mandated by law.  Defendants submit that both the HBI-120 and the PX1 share the same external design elements of the AS&E Mini-Z which was developed by Bradshaw and Dr. Rothschild while they worked together at AS&E.  They also assert

-10-

that the alleged confidential improvements of 1) increased x-ray energy, 2) improved image analysis and 3) using buttons to control the device were not confidential ideas but rather goals or aspects shared by all competitors in the industry. Defendants conclude that this suit is merely an attempt by Viken to stifle competition and to force Videray out of business.

Finally, defendants declare that Viken comes to this Court with unclean hands and thus its motion for injunctive relief should be denied as a matter of equity.  They argue that Rothschild engaged in misconduct while working at AS&E, including by misappropriating proprietary information of AS&E, forming a business plan for Viken (then known as Heuresis) while at AS&E and soliciting Bradshaw to join his new company while at AS&E in violation of his non-solicitation agreement.  Dr. Rothschild denies those allegations of impropriety.

In support of their arguments, defendants submitted the sworn affidavit of Lee Grodzins ("Dr. Grodzins"), a physicist and engineer with extensive experience in researching and developing x-ray scanner technology.  He worked with Dr. Rothschild and Bradshaw at AS&E.  He states that Bradshaw developed the protype handheld x-ray scanner that would become AS&E's Mini-Z, while Dr. Rothschild's primary contribution was the software coding for the product.

Dr. Grodzins attests that every x-ray backscatter device will necessarily contain basic universal elements that are known by all designers in the industry and thus are not proprietary, including 1) an x-ray tube or other radiation source, 2) a scanning method, 3) a shielding element and 4) software to translate the radiation pulses into images.  He also asserts that a company called Newton Scientific designs the x-ray tubes used in the products developed by AS&E, Viken and Videray and that the design and associated power of those tubes is proprietary to Newton Scientific and not to Viken or any other company.  Finally, Dr. Grodzins describes the various differences between the designs of Viken's HBI-120 and Videray's PX1, most importantly that 1) the PX1 is heavier than the HBI-120 due to its larger detector array and 2) the two devices use different chopper wheel designs.

Defendants also submitted the affidavit of former-CEO Grodzins.  He is the co-founder and former CEO, President and Chairman of the Board of Directors of Viken (then known as Heuresis).  He explains that he knew that Bradshaw used his personal Dropbox account to maintain Viken files, that everyone working in research and development had access to the files in his Dropbox and that he had no problem with Bradshaw using his Dropbox account for that purpose.  He also claims that McCabe fabricated the allegations against Bradshaw, including that

Bradshaw was planning or operating a competing business while at Viken.  Finally, former-CEO Grodzins states that when Bradshaw returned his company desktop computer and laptop, he watched Bradshaw delete all company files from both devices.

Defendants also submitted the affidavit of Louis Wainwright ("Wainwright") who used to work with Dr. Rothschild and Bradshaw at AS&E.  He attests that he was the Project Manager at AS&E and that Bradshaw developed the prototype device that would become the Mini-Z while under his supervision.  Wainwright explains that there are conventional features of x-ray backscatter devices common to all instruments in the market, including a shielding element and chopper wheel, and that there is a limited number of design options available for those elements which are not proprietary.  He asserts that the 1) size, 2) shape, 3) energy, 4) power and 5) weight of handheld x-ray backscatter devices are readily known to anyone in the field which makes it impossible to determine whether proprietary information from one manufacturer was used by another.  Wainwright also notes the differences between the chopper wheel design and detector geometry of the HBI-120 and the PX1.  He concludes that Bradshaw had demonstrated the skill and knowledge while at AS&E to be able to fully design Videray's PX1 without any of Viken's alleged proprietary and confidential information.

In response to the affidavits submitted by defendants,
plaintiff submitted the affidavit of Joseph Callerame
("Callerame"), the former Chief Technology Officer of AS&E.  He
attests that he supervised Dr. Rothschild and Bradshaw when they
worked together at AS&E and that Dr. Rothschild, not Bradshaw,
was primarily responsible for the design and development of the
Mini-Z.  Callamere contends that, "[w]hile Mr. Bradshaw was a
good mechanical engineer", his main role was to execute Dr.
Rothschild's design.

## II.  Motion for a Preliminary Injunction

### A.   Legal Standard

In order to obtain a preliminary injunction, the moving
party must establish 1) a reasonable likelihood of success on
the merits, 2) the potential for irreparable harm if the
injunction is withheld, 3) a favorable balance of hardships and
4) the effect on the public interest. Jean v. Mass. State
Police, 492 F.3d 24, 26-27 (1st Cir. 2007).  Out of these
factors, the likelihood of success on the merits "normally
weighs heaviest in the decisional scales." Coquico, Inc. v.
Rodriguez-Miranda, 562 F.3d 62, 66 (1st Cir. 2009).

The Court may accept as true "well-pleaded allegations [in
the complaint] and uncontroverted affidavits." Rohm & Haas Elec.
Materials, LLC v. Elec. Circuits, 759 F. Supp. 2d 110, 114, n.2
(D. Mass. 2010) (quoting Elrod v. Burns, 427 U.S. 347, 350, n.1

-14-

(1976)).  The Court may also rely on otherwise inadmissible evidence, including hearsay, in deciding a motion for preliminary injunction.  See Asseo v. Pan Am. Grain Co., Inc., 805 F.2d 23, 26 (1st Cir. 1986).  Ultimately, the issuance of preliminary injunctive relief is "an extraordinary and drastic remedy that is never awarded as of right." Peoples Fed. Sav. Bank v. People's United Bank, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011)).

### B.   Application

#### 1.   Likelihood of Success

##### i.   Breach of Contract

Under Massachusetts law, to prove a breach of contract the plaintiff must demonstrate that: 1) "there was an agreement between the parties"; 2) "the agreement was supported by consideration"; 3) "the plaintiff was ready, willing, and able to perform his or her part of the contract"; 4) "the defendant committed a breach of the contract"; and 5) "the plaintiff suffered harm as a result". Bulwer v. Mount Auburn Hosp., 46 N.E.3d 24, 39 (Mass. 2016).

A valid contract in the form of the NDA clearly existed. The only dispute is whether Bradshaw breached the terms of that agreement.  Viken submits that Bradshaw breached the NDA by, among other things, using proprietary and confidential

-15-

information without the written consent of the company,
retaining copies of that information after he left the company
and soliciting employees to join his new company while still
employed at Viken.  Defendants contest all of those allegations.

At both the hearing and in its written submissions,
plaintiff was unable to direct the Court to a single feature of
the PX1 which contained allegedly proprietary or confidential
information of Viken.  Indeed, plaintiff does not contest the
affidavits of Dr. Grodzins and Wainwright which assert that the
shared features of the PX1 and the HBI-120 are generic design
elements generally known in the industry.  Moreover, while
plaintiff argues that Bradshaw has overstated his contribution
to the development of the Mini-Z and HBI-120, it does not
dispute that Bradshaw has extensive knowledge and experience in
this area of technology (and thus is capable of developing an x-
ray backscatter imaging device based on that expertise).
Indeed, in the counter affidavit submitted by plaintiff,
Callerame admits Bradshaw is a capable mechanical engineer.

Nor has Plaintiff referred the Court to any particular
combination of commonly known design elements that, when
combined, constitutes proprietary or confidential information.
There are apparently key differences between the designs of the
PX1 and the HBI-120, such as the design of the chopper wheel and
the use of a different software system for testing the x-ray

-16-

device.  Those differences suggest defendants did not merely
copy the proprietary and confidential features of the HBI-120.

Rather, Viken relies on circumstantial evidence that
Bradshaw's personal Dropbox account contained numerous files
related to the HBI-120 as well as accusations of McCabe from
2017.  With respect to the files contained in the Dropbox
account, defendants provide the sworn affidavit of former-CEO
Grodzins that he saw Bradshaw delete all of those sensitive
files before departing the company.  Defendants also submit that
plaintiff obtained copies of the Dropbox files from the hard
drive of Bradshaw's returned work laptop rather than from his
current Dropbox account which plaintiff seems to admit in the
affidavit of its current CEO.  The management of Viken in 2017
clearly did not believe the accusations of McCabe because
Bradshaw was asked to return only a few days after his
termination.  It is strange then that plaintiff now relies on
those very same discredited allegations to support its motion
for injunctive relief.

Perhaps most telling is the statement of plaintiff's
counsel at the hearing that Viken would need discovery to
determine what proprietary or confidential features defendants
misappropriated.  A preliminary injunction is an extraordinary
form of relief requiring more than mere speculation to justify.
See, e.g., In re Rare Coin Galleries of Am., Inc., 862 F.2d 896,

902 (1st Cir. 1988).  At this stage, plaintiff has referred the Court only to design features of the PX1 and HBI-120 which are generally known and universal in the industry.  The mere fact that the two devices share those features does not support an inference that defendants copied them from Viken by using its proprietary and confidential information.  Plaintiff has not therefore met its burden of demonstrating a reasonable likelihood of success on its claim for breach of the NDA.

### ii.  Misappropriation of Trade Secrets

A plaintiff can establish misappropriation of trade secrets under M.G.L. c. 93, § 42 by proving that the defendant acquired the trade secret through improper means (including by theft, bribery, misrepresentation or breach of contract but not by reverse engineering) or by disclosing or using the trade secret of another obtained through improper means without that person's consent. M.G.L. c. 93, § 42.  A plaintiff may also bring a claim under the DTSA for misappropriation of a trade secret if it is related to a product or service used in or intended to be used in interstate or foreign commerce. 18 U.S.C. § 1836(b)(1).  The standard for misappropriation under the DTSA is substantially similar to that under Massachusetts law. Compare 18 U.S.C. § 1839(5)-(6), with M.G.L. c. 93, § 42(1)-(2).

To prevail on a claim of misappropriation of trade secrets under Massachusetts law, a plaintiff must establish that 1) the

information at issue constitutes a trade secret, 2) the
plaintiff took reasonable measures to secure the confidentiality
of the information and 3) the defendant obtained the trade
secret through improper means. Optos, Inc. v. Topcon Medical
Systems, Inc., 777 F. Supp. 2d 217, 238 (D. Mass. 2011); see
also M.G.L. c. 93, § 42(4) (defining "trade secret").  A trade
secret is any confidential information used in the plaintiff's
business that "gives [the owner] an advantage over competitors
who do not know or use it". Id. (quoting J.T. Healy & Son, Inc.
v. James A. Murphy & Son, Inc., 260 N.E.2d 723, 729 (Mass.
1970)).  Matters of public knowledge or information generally
known in an industry cannot be a trade secret. J.T. Healy, 260
N.E.2d at 729; see also Ruckelhaus v. Monsanto Co., 467 U.S.
986, 1002 (1984).

   For the same reasons that plaintiff has failed to
demonstrate a reasonable likelihood of success on its breach of
contract claim, so too has it has failed to demonstrate a
likelihood of success on its claims for misappropriation of
trade secrets.  Viken has not shown that any common features of
the PX1 and the HBI-120 are protectable.  According to the sworn
affidavits of experts in the field, the 1) size, 2) shape, 3)
energy, 4) power and 5) weight of a handheld x-ray backscatter
device and the use of 6) an x-ray tube, 7) a scanning method, 8)
a shielding element and 9) software to translate the radiation

-19-

pulses into images are all features generally known in the industry and thus not trade secrets.  Plaintiff has not controverted the statements of defendants' affiants.  Indeed, the particular x-ray anode used by AS&E, Viken and Videray is supplied by the same third-party manufacturer and thus at least that component is not the proprietary information of Viken.

Moreover, plaintiff has not suggested that any particular combination of those individually unprotectable components is somehow a protectable trade secret of Viken.  It has not therefore shown that any of the features of the HBI-120 is a trade secret, let alone that defendants actually took or used that information through improper means.

### iii. CFAA Claim

A claim under the CFAA requires a plaintiff to prove that the defendant

> knowingly and with intent to defraud, accesse[d] a
> protected computer without authorization, or
> exceed[ed] authorized access, and by means of such
> conduct furthere[d] the intended fraud and obtain[ed]
> anything of value, unless the object of the fraud and
> the thing obtained consists only of the use of the
> computer and the value of such use is not more than
> $5,000 in any 1-year period.

18 U.S.C. § 1030(a)(4).  The phrase "without authorization" is not defined in the statute, but this Court has previously held that it should be read broadly to include an employee who accesses his employer's computer, without the employer's

knowledge, to acquire an interest adverse to his employer. Guest-Tek Interactive Entm't, Inc. v. Pullen, 665 F. Supp. 2d 42, 45 (D. Mass. 2009) (citing EF Cultural Travel BV v. Explorica, Inc., 274 F.3d 577, 582-84 (1st Cir. 2001)).  To "exceed authorized access" is defined as

> to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter.

18 U.S.C. § 1030(e)(6).

Plaintiff has shown that it maintained sensitive information on its computers and server and that Bradshaw accessed that information and downloaded it to his personal Dropbox account.  It has not demonstrated, however, that he did so without the permission or consent of Viken.  Indeed, other members on Viken's research and development team, including Dr. Rothschild, apparently had access to the files on Bradshaw's personal Dropbox account (as shown through emails sent to and from Dr. Rothschild's account) and former-CEO Grodzin attests that he was aware of and had no issue with Bradshaw's use of his personal Dropbox account for that purpose.

Furthermore, as explained above, plaintiff has not demonstrated a reasonable likelihood that Bradshaw used that information in a manner that was adverse to the interests of Viken or in violation of his obligations under the NDA.

Accordingly, plaintiff has not met its burden of demonstrating a reasonable likelihood of success on the merits of its claim for violation of the CFAA.

### 2.   Potential for Irreparable Harm

While the likelihood of the success on the merits provides the "touchstone of the preliminary injunction inquiry", the Court also considers the second element, namely irreparable harm. Philip Morris, Inc. v. Harshbarger, 159 F.3d 670, 674 (1st Cir. 1998).

Once a plaintiff has demonstrated a reasonable likelihood of success on a claim for misappropriation of trade secrets, irreparable harm is presumed. EchoMail, Inc. v. Am. Express Co., 378 F. Supp. 2d 1, 4 (D. Mass. 2005).  Because Viken has failed to demonstrate a reasonable likelihood of success on its claim for misappropriation of trade secrets, it is not entitled to that presumption of irreparable harm.  Furthermore, it is speculative at this point that defendants have or will use any of the proprietary and confidential information of Viken. Bradshaw is subject to a presumably valid NDA and is expected to continue to comply with the terms of that agreement but a preliminary injunction at this stage is unwarranted.

Given that plaintiff has failed to satisfy the first two prongs, it is unnecessary for the Court to address the remaining factors.

## ORDER

For the forgoing reasons, plaintiff's motion for a preliminary injunction (Docket No. 9) is **DENIED.**

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated June 14, 2019